THE C. G. R.–180.

No. 3752.

District Court, E. D. Michigan, S. D.

Dec. 30, 1946.

John C. Lehr, U. S. Atty., and Morris Zwerdling, Asst. U. S. Atty., both of Detroit, Mich., and John T. Casey, of Washington, D. C., for petitioner.

Miller, Canfield, Paddock & Stone, Frederic B. Besimer, and Ward & Plunkett, all of Detroit, Mich. (Horace L. Atkins, of New York City, of counsel), for respondents.

KOSCINSKI, District Judge.

This is a petition by the United States of America alleging chartered ownership of Coast Guard Patrol Vessel C. G. R.-180, for limitation of and exoneration from liability, civil and maritime, as a result of an explosion and fire aboard that vessel on December 5, 1942, while being laid up for the winter.

Respondents filed claims totalling approximately $35,000 for damages to or destruction of boats in adjoining wells, and for damage to land installations or structures.

It is the government's position that it does not know the cause of the explosion and fire, that it was not negligent; that if negligence is established, it is without privity or knowledge, it being at the time a chartered owner of the vessel under 46 U.S.C.A. § 186, and entitled to limitation of liability under 46 U.S.C.A. § 183; that if negligence is not proved it should be exonerated from any liability.

Claimants deny the government to be a chartered owner, but only a mere bailee and therefore not legally in a position to avail itself of the benefits of the limitation of liability statute; they charge that the explosion and fire, with the consequent damage, was the result of the government's negligence in permitting gasoline vapor deposits to form in the bilges of the vessel, and ignition of these vapors from the flame in the kerosene heater; that the government failed to enforce regulations as to securing heaters on deck and to clean out bilges to rid them of gasoline vapors; and that the government negligently failed to properly supervise the laying up of the vessel for the winter.

On or about August 1, 1942, the Coast Guard acquired for the duration of the war from one Vernon W. Cleverdon the use of the 32-foot motorboat Whirlaway, under Act of Congress, December 16, 1941, Chap. 586, Sec. 1, 55 Stat. 807, 14 U.S.C.A. § 72. Thereafter it was operated as Coast Guard Reserve Vessel 180 in patrolling the Detroit River and adjacent waters, until on or about December 4, 1942, when its engine was removed for overhauling and the vessel prepared for her winter lay-up.

The Coast Guard Reserve was created and established February 19, 1941, Chap. 8, Title II, Sec. 201, 55 Stat. 11, as amended Nov. 23, 1942, Chap. 639, Sec. 2(2), 56 Stat. 1021, 14 U.S.C.A. § 301. Sec. 302 of Title 14 U.S.C.A. provided that the Reserve shall be a component part of the Coast Guard.

By Executive Order No. 8929, Nov. 1, 1941, 14 U.S.C.A. § 1 note, 6 Fed.Reg. 5581, the President directed that the Coast Guard shall from this date until further order operate as a part of the Navy, subject to the orders of the Secretary of the Navy.

Under 14 U.S.C.A. § 266, Act Feb. 19, 1941, Chap. 8, Title 1, Sec. 7, 55 Stat. 10, it was provided that any motor boat or yacht, while assigned to Coast Guard duty as therein authorized, shall be deemed to be a public vessel of the United States, and within the meaning of Sec. 71 of this Title shall be deemed to be a vessel of the U. S. Coast Guard.

The C. G. R.-180 carried a crew of four with Boatswain's Mate, 2nd Class, Vernon W. Cleverdon, as the commanding officer of the boat. They were paid by the U. S. Coast Guard, their uniforms and equipment were furnished by the U. S. Coast Guard, and the vessel was manned, provisioned and navigated and supplied with all necessaries by the U. S. Coast Guard. When the cold weather set in the vessel was equipped with two kerosene-burning Perfection heaters, one in the upper or rear deck, and one in the lower or forward deck. Regulations provided that the heaters were to be secured to the vessel, and they were so secured during patrolling operations.

When patrolling operations were suspended because of cold weather, the engine of the C. G. R.-180 was removed for over-

hauling at the Coast Guard Base on December 4, 1942, preparatory to her lay-up for the winter.

In taking the engine out of the vessel the heaters were removed and not re-secured. The vessel was then towed about a mile to Fisher's Boat Works to be stored for the winter. The weather was very cold. The tank located in the rear part of the boat and containing a quantity of gasoline remained in the boat, with the gas feed line ten feet in length attached. The end of this gas feed line, about 15 inches in length, was turned upward at a point about where it connected with the carburetor prior to the engine's removal. A valve at the tank where the fuel line connects was shut off. The fuel line had a capacity of not to exceed four ounces of gasoline.

At the Fisher Boat Works, the C. G. R.-180 was raised on slings (chains) before being lowered to rest on timbers. This operation was performed by employees of the Fisher Company under contract with the Coast Guard. She was resting on the slings when the explosion occurred, and was not yet officially laid up for the winter. The two windows on the upper deck were frozen open from the time the engine was removed.

Blane Bayhurst, seaman first class, a member of the crew of the C. G. R.-180, went aboard the vessel about 9:30 a. m. on December 5th "to clean up the ship," to remove dishes, food stuffs and personal belongings. He filled the heater with kerosene and lit it to unfreeze the windows and to keep the cabin warm. While the heater remained in the upper cabin, he made several trips to the lower cabin for his clothes. He fried a steak on the alcohol-burning galley stove, located about three or four feet above the floor level and in the immediate vicinity of the bilge hatch, in the lower or forward deck. He had the flame going ten to fifteen minutes. He smelled no odor of gasoline in the lower cabin.

While Bayhurst was still aboard that morning, one Peter Bliznuk, an employee of the Fisher Boat Works, boarded the vessel about 11 a. m., opened the bilge hatch, and drained the water by unscrewing the drain plug. He had to bend over on his knees to do that. This operation consumed only about five minutes time. He was right down in the bilge hold and did not smell any gasoline vapors. He did not replace the drain plug nor the bilge hatch cover. It is always left open when the vessel is laid up for the winter. Bliznuk then left and Bayhurst also left the boat after turning off the heater.

Bayhurst returned to the ship about 1:30 p. m. and re-lit the heater in the upper cabin. Cleverdon came aboard about 4 p. m. Both windows in the upper cabin were still frozen open. Bayhurst was in the lower cabin a large part of the time, carrying out his personal belongings, and for convenience hooked open the door between the upper and lower cabins. Cleverdon had an electric lantern which he took with him to the lower cabin. Bayhurst followed him into the lower cabin, carrying the kerosene-burning heater. The explosion occurred while he was in the act of setting the heater down on the floor.

Coast Guard headquarters for the district which included the Detroit area are at Cleveland, Ohio, in charge of the district commander. Responsible to him in this area was Lt. Cmdr. Henry A. Meyer, Commanding Officer of the Coast Guard Base at Detroit and Captain of the Port of Detroit. He was in charge of all the Coast Guard patrol vessels such as the C. G. R.-180. His assistant, Lt. Myron E. Merry, had immediate supervision of the activities of the patrol vessels. About December 1st the weather became very cold and he issued instructions to Chief Boatswain's Mate Kenneth J. Dahlka and Warrant Boatswain Raymond A. Priebe, who was stationed at the Coast Guard Base, to lay up the vessels for the winter. Dahlka and Priebe were in direct charge of the operation of the patrol boats under Lt. Merry. The duty of supervising the laying-up of the vessels for the winter was the direct responsibility of Priebe and Dahlka. Dahlka issued instructions to the engineering officer at the Base to remove the engines. This engineering officer had a rating of machinist's mate. His name was not disclosed at the trial nor was he produced as a witness.

Dahlka and Priebe were experienced in handling small vessels on the Great Lakes for many years.

Five patrol boats had been laid up for the winter prior to the C. G. R.-180, and the same practice or procedure was followed in all cases. The gasoline tank and the fuel line were left in the vessel in each case. Bilges on the various patrol boats were cleaned out and flushed and at periodic times washed out with a compound. The patrol boats were examined quite frequently, and instructions issued to the crew with reference to cleanliness and care of the vessels. Whenever bilges were found unclean, all hands were ordered to stay aboard until the situation was corrected. There never had been any occasion to place any of the crew on restriction for anything faulty aboard the C. G. R.-180. The ship was inspected many times and the vessel was always found to be clean, including its bilges. The bilges were cleaned with trisodium and were pumped every day.

There were no rules or regulations prescribed by the U. S. Coast Guard for the lay-up of the Coast Guard Reserve vessels. It was a routine operational function performed by the Coast Guard personnel and the lay-up of the C. G. R.-180 was in accordance with such routine and customary operational procedure undertaken by the Coast Guard personnel and the employees of the Fisher Boat Works. The explosion occurred before the vessel's lay-up had been completed.

Neither the government nor the claimants produced any witness or witnesses who actually performed the job of removing the engine from the C. G. R.-180, nor did either side call any of the employees of Fisher Boat Works who raised the vessel on slings.

### Discussion

■ The principal issue here is that of negligence and, unless claimants establish negligence on the part of the Coast Guard personnel by a preponderance of the evidence, they must fail in their quest for damages.

■ It is the claimants' theory that gasoline vapors were present in the bilges of the C.G.R.-180 and that these vapors, formed by gasoline drippings leaking out of the tank and the gas line, finding their way into the engine hatch and the bilge hatch, were ignited by coming in contact with the flame of the kerosene heater carried by Bayhurst, resulting in the explosion and fire. Negligence will not be presumed; the burden of establishing it is on the claimants. While negligence may be established by circumstantial evidence, it is also true that the mere happening of an accident does not give rise to a claim for resulting damages without proof of negligence.

There is a total lack of any testimony of gasoline leakage, gasoline spillage, or gasoline drippings in the hold of the vessel. No witness was produced who aided in the removal of the engine from the vessel who, presumably, could testify as to whether or not there was any spillage of gasoline in this operation; neither is there any proof, except by inference, that the gasoline fuel line contained any quantity of gasoline after the removal of the engine. Claimants' expert testified that while the gasoline fuel line would normally hold approximately four ounces of gasoline, he did not know whether there was any gasoline in the fuel line. He said he believed there was some gasoline in the fuel line. This fact could be established to a certainty by producing one or more of the members of the Coast Guard Board of Inquiry who had made an investigation shortly after the explosion and fire. No credible evidence was submitted that the gasoline tank had leaks prior to the explosion.

Claimants' expert attempted to lay a foundation for establishment of negligence on a purely hypothetical basis. He believed that leaks in the tank existed prior to the fire; it was his opinion that the gas line was not cleaned out, he assumed there had been some drippings of gasoline from the tank, and that, assuming that there was a quantity of gas that might come from the gas line in the bilges, it would be a competent producing cause of an explosion. But, he also said that a concussion, referring to an explosion, could possibly cause leaks in the tank. He agreed, furthermore, that gasoline vapors dissipate in air under certain conditions and that the removal of

the drain plug would provide an outlet for gas vapors present in the bilge, that the more openings there are the better the ventilation and the quicker the dissipation of the vapors, and that gasoline explodes when it comes in contact with air when a proper mixture is present. He did not define what the proper mixture should be. He further said that gasoline has a definite odor and that the average individual could distinguish it from other odors.

The claimants can derive but little comfort from the attitude of the Michigan Supreme Court on the question of presumptive negligence. The rule is thus stated: "This court has not adopted the rule res ipsa loquitur. We have uniformly held that the happening of the accident alone is not evidence of negligence; and we have as uniformly held that negligence may be established by circumstantial evidence, and that, where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inferences from established facts, at least a prima facie case is made." Burghardt v. Detroit United Railway, 206 Mich. 545, 173 N.W. 360, 361, 5 A.L.R. 1333.

In relying on this rule it was incumbent upon the claimants to establish the basic fact that free gasoline found its way into the bilges, that gasoline vapors were formed and that these gasoline vapors stayed in the bilges of the ship. Having established as a basic fact that free gasoline found its way into the bilges of the ship, they could then rely on the presumed fact that gasoline vapors were formed, which were or were not present in the ship at the time of the explosion and fire. The rule is thus stated in the American Law Institute Model Code of Evidence:

"Rule 701. Definitions.

"(1) Basic Fact.—Basic fact means the fact or group of facts giving rise to a presumption.

"(2) Presumption—Presumed Fact—Presumption means that when a basic fact exists the existence of another fact must be assumed, whether or not the other fact may be rationally found from the basic fact. Presumed fact means the fact which must be assumed.

"Rule 702. Establishment of Basic Fact.

"The basic fact of a presumption may be established in an action by the pleading, or by stipulation of the parties, or by judicial notice, or by evidence which compels a finding of the basic fact, or by a finding of the basic fact from the evidence."

 The proof submitted by claimants falls short of the necessary standard set up by these rules of evidence. In effect, the court is asked to find negligence on the basis of a double inference. This the court cannot do. It was early said by the Supreme Court of the United States: "Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved, and not themselves presumed." United States v. Ross, 92 U.S. 281, 283, 23 L.Ed. 707.

And in the case of Moscato v. Prince Line, Ltd., 164 App.Div. 412, 415, 150 N.Y.S. 225, 227, the court said: "When the evidence of the party, upon whom the burden of proof rests, is circumstantial in character, and the circumstances are equally consistent with the absence or with the existence of the fact sought to be established, the case should not be submitted to the jury, since, in that event, the burden of proof is not sustained, or, to put it concretely, if the circumstances of this case point equally to the absence as to the presence of defendant's negligence, or point in neither direction, plaintiff should be nonsuited."

At the time of the explosion the C.G.R.-180 was physically under the custody and in the possession of the Fisher Boat Works, and therefore was not in the sole possession, custody and control of the Coast Guard. Assuming, however, but not so deciding, that free gasoline existed in the vessel which found its way into the bilges, there would be not to exceed four ounces of gasoline from the gas fuel line. This amount of gasoline would be dissipated within less than twenty-four hours. Gasoline is a highly volatile, as well as inflammable, liquid. Its odor is easily detected. Being three or four times heavier than air, it will always seeks the lower level. Dissipation of gasoline vapors is accelerated by air circulating through the area,

or a current of air disturbing the vapors. Gasoline vapor will form strata, but will not stabilize itself. It is an escaping chemical substance, and it is incompatible with stability. It is dangerous in any confined space. Gasoline vapors, if once ignited, have a tendency to return back to the source from which they originated. Flashing back is a characteristic of gasoline vapors. If this explosion and subsequent fire were caused by the presence of gasoline vapors on board the C.G.R.-180, the two men in the cabin at the time of the explosion would have suffered injuries, would have borne marks of the explosion, but they were both able to leave under their own locomotion. Immediately outside the companion-way are located the two hatch covers used for access to the engine compartment. The source of any free gasoline would be either from the gas fuel line or from leaks in the tank, according to the theory of the claimants. Assuming that the gasoline vapors did come from the pipeline or from the bank, its vapors would have been confined in the area under the deck. If the explosion were caused by the presence of gasoline vapors, the fire and the explosion would have traveled back and caused a similar and almost simultaneous explosion within the area of the engine compartment. The minimum result of that explosion would have been a violent displacement of these two hatch covers, with the result that they would have been somewhere else, and not in a position to be used as a walk-way or exit for the two men who came out of the cabin.

The diffusion of the gasoline vapors would be aided by the towing of the vessel in the water for one mile, with the windows frozen open, by the hooked door leading to the companion-way, by the removal of the drain plug in the bilge hatch, by movement of the air current caused by the movement of the vessel in the water, by men working around the engine and removing it from the vessel. Whatever may have been the cause of the explosion on board the C.G.R.-180 the proofs submitted by the claimants are not convincing that it was caused by the existence of gasoline vapors in the bilges of the vessel, since under the evidence gasoline vapors could not be present to any degree sufficient to cause an explosion of even a minor nature. There is no credible evidence that leaks existed in the gasoline tank prior to the operation of the removing of the engine and, even assuming that there existed four ounces of gasoline in the gasoline fuel line, this was not sufficient to have caused an explosive atmosphere to exist when the vessel was at the Fisher Boat Works at the time when the explosion occurred.

Testimony in this regard was given by William T. Butler, the government's witness, and the court accepts his testimony and opinion as more persuasive than that of the claimants' expert witness.

### Conclusions of Law

■ 1. The burden of proof by a preponderance of evidence is upon the damaged claimants to establish as a basic fact the existence of free gasoline or board the C.G.R.-180 by spillage, seepage, or dripping from leaks in the gasoline tank or from the gasoline fuel-line. They have failed to sustain the burden of proof on this point. Proof of this fact is essential to their case, since then a presumption could be indulged in as to the existence of gasoline vapors on board the vessel, which, coming in contact with the flame of the heater, would be a competent factor in producing the explosion. Not having established the basic fact, no inference can be indulged in as though the basic fact had been proven. The only presumptions of fact which the law recognizes are immediate inferences from facts proved. Manning v. John Hancock Mutual Life Insurance Co., 100 U.S. 693, 25 L.Ed. 761.

■ 2. No negligence was proven on the part of the government, nor any facts from which negligence could be inferred.

3. Claimants' theory of the government's negligence in this case is based upon surmise, conjecture, and speculation. This testimony falls short of meeting the required standards in establishing a basic fact by circumstantial evidence.

In this view of the evidence, it becomes unnecessary to decide the remaining questions in this proceeding.

Decree for petitioner in exoneration from all liability. Claims of damaged claimants dismissed.